No. 81-429

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

GREGORY KENT MAXWELL,

Defendant and Appellant.

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable William J. Speare, Judge presiding.

Counsel of Record:

For Appellant:

Allen Beck argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Dorothy McCarter, Assistant Attorney General, argued,
Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Klaus Richter argued, Deputy County Attorney,
Billings, Montana

Submitted: February 26, 1982

Decided: June 28, 1982

Filed: JUN 2 8 1982

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendant appeals his conviction in Yellowstone County District Court, of sexual intercourse without consent.

Defendant raises several issues. First, he argues that his conviction is unsupported by substantial evidence. This claim is based on the assertion that the testimony of the complaining witness is so inherently incredible that it is unworthy of belief as a matter of law. He also claims that his alibi defense entitles him to a reversal as a matter of law. Second, he claims that the jury was guilty of misconduct during deliberations by improperly considering facts not in evidence and by disregarding competent scientific evidence. Third, he claims that the jury foreperson, because of her aggravated diabetic condition, was compelled to surrender her honest conviction that the defendant was innocent. We affirm.

On November 13, 1980, the victim's sister reported to the Yellowstone County Sheriff's Department that the victim had been sexually assaulted. Deputies arrived at the victim's residence near Ballentine to investigate and she was taken to a Billings Hospital for treatment of a number of superficial cuts inflicted during the attack.

The evening following the attack, the victim gave the police a statement containing her first version of the crime. She stated that, while hanging clothes outside her trailer home during the afternoon, she was grabbed from behind by a very large, fat, red haired man who forced her into a barn located on the property. She stated that her attacker had large bumps on his face and a very peculiar voice. The attacker then ripped and cut off her clothes with a hunting

-2-

knife and forced her to perform oral sex twice. The victim stated that both times the attacker removed his penis from her mouth and "it went" all over her face and hair. The attacker cut her repeatedly with the knife and threatened her life if she told anyone of the attack, and then fled. After waiting in the barn for a considerable time, she returned to her house, threw her clothes in the garbage can and took several baths. She finally called her sister in Hardin, requesting that she come to her house because she had been hurt. The sister called the police shortly after she arrived at the victim's house.

On November 14, the day after the attack, the victim again gave police a statement which was substantially the same as the one given the day before. Sometime after this, the victim was shown a number of photographs by the police. From five photographs, the victim selected two that she felt were similar to the man she had described. One of these individuals was questioned by the police, but no charges were filed.

On November 24, the victim called Detective Ellis, and asked to speak with him concerning the attack and Detective Ellis drove to her house. During this interview, the victim substantially changed her story about when, where, and how the crime took place, and identified her assailant as Greg Maxwell, a person whom she had met on one occasion about one month before the attack. She recanted her previous statements, saying that she gave false information out of fear that Maxwell would seek revenge if she reported him to the police. On the same day, the victim gave another account of the attack.

While doing her laundry at about 7:45 a.m., she answered a knock on her door. She recognized the defendant, invited him inside, and offered him a cup of coffee. When she turned to make the coffee, the defendant grabbed her from behind and forced her at knifepoint into the bedroom. He cut away her clothes and twice forced her to perform oral sex, and cut her repeatedly with the knife. Her account also left the police with the impression that Maxwell had ejaculated, although she had not expressly stated this.

Maxwell was arrested on the afternoon of November 24 and charged with sexual intercourse without consent. When first questioned as to his whereabouts on November 13, Maxwell stated that he was either at home in Billings, or at work on the Crow Reservation. Maxwell gave permission to search his truck and a hunting knife was found. At trial, the victim stated that the knife was "similar" to the one used in the attack, but she was unable to positively identify it, because she had not seen the handle of the knife used in the attack. The defendant's knife was admitted at trial without objection.

During the investigation, the police learned that Maxwell suffered from a condition known as "retrograde ejaculation" which prevented him from emitting any ejaculate. This caused Detective Ellis some concern because the victim's account had left him with the impression that the attacker had twice ejaculated on her face and hair. When questioned by Ellis, the victim explained her previous statement, saying that she was not aware of any ejaculate. She further explained that she actually meant to say that her attacker had rubbed his penis on her face and hair. Because her face had been cut, she felt "something sticky" on her face which may have been her own blood. She also stated that she had never

-4-

previously had oral sex, and had never seen semen.

The victim testified that the assault took place at approximately 7:45 a.m. The defendant relied on alibi and the victim's prior inconsistent statements to impeach her.

Maxwell's girlfriend testified that he was still in bed in their apartment when she left for work at 6:30 a.m. Maxwell testified that he arose at about 7:00 or 7:30 a.m. and made coffee while reviewing a booklet from the Builder's Exchange. (He is a self-employed drywaller and frequently relies on the Builder's Exchange in finding jobs.) Defendant testified that at about 8:20 a.m., he talked on the telephone with his brother, Tom Branstatter, concerning a possible hunting trip. His brother confirmed the 8:20 a.m. telephone call. Defendant testified that he talked with his brother for approximately 30 minutes, and after the call, he continued reviewing the Builder's Exchange booklet.

Defendant testified that at about 9:00 a.m., he left his apartment and went to the Builder's Exchange to look at specific sets of plans on which he intended to bid. On his arrival he found that these plans were not available, and he then went to visit his other brother, Ted Maxwell. He arrived at Ted Maxwell's home between 10:00 and 10:30 a.m., and remained there until close to 3:00 p.m. Both Ted Maxwell and Ted's wife testified to the defendant's presence in their home from approximately 10:00 a.m. to 3:00 p.m.

SUBSTANTIAL EVIDENCE

Defendant's time, other than his own testimony, is unaccounted for between 6:30 a.m. and 8:20 a.m. Nor, of course, could Tom Branstatter be sure that defendant called

him from home at 8:20 a.m. Nonetheless, defendant argues the uncontradicted testimony of his family and girlfriend established an alibi. He further argues that the testimony of the victim, was so inherently incredible that, as a matter of law, it cannot support the verdict.

The jury is the sole judge of the credibility of a witness. Batchoff v. Craney (1946), 119 Mont. 157, 172 P.2d 308. Although this case is especially troubling because of the victim's prior inconsistent statements, these inconsistencies do not make her testimony inherently incredible. "Only in those rare cases where the story told is so inherently improbable or is so nullified by material self-contradictions that no fair-minded person could believe it may we say that no firm foundation exists for the verdict based upon it." State v. Gaimos (1916), 53 Mont. 118, 162 P. 596 at 599. A conviction of sexual intercourse without consent may be based entirely on the uncorroborated testimony of the victim. State v. Metcalf (1969), 153 Mont. 369, 457 P.2d 453. See also, State v. Bouldin (1969), 153 Mont. 276, 456 P.2d 830, in which this Court stated:

> ". . . disputed questions of fact and the credibility of witnesses will not be considered on appeal but that determination of such matters is within the province of the jury. As long as there is substantial evidence to support the verdict it will not be disturbed on appeal (citing cases). Here, the testimony of the prosecutrix and the surrounding circumstances constituted substantial evidence to support the conviction." 456 P.2d at 834-835.

It is undisputed that the victim had suffered a violent physical assault. She was treated for many superficial lacerations that, in all probability, were not self-inflicted. The question was whether the defendant had assaulted her and whether he had raped her. The victim's first account differed greatly from her later account of the attack. The defense

-6-

attempted to impeach her testimony with her first account of the attack. She admitted making the first statement, but explained that she gave the initial false account because of her fear that the defendant would seek revenge if she identified the defendant as her assailant. She testified that the defendant threatened her if she went to the authorities. It was for the jury to determine whether, because of her conflicting statements, she was worthy of belief. The jury was obviously satisfied with her explanation of her first statement. Her conflicting statements do not justify this Court to declare that her testimony is, as, a matter of law, unworthy of belief.

The defendant's alibi witnesses could not account for his presence at the time of the assault, approximately 7:40 a.m. His girlfriend was with him until 6:30 a.m., and he arrived at his brother's home at about 10:30 a.m. In fact, the jury was aware that the distance between Billings, where the defendant resided, and the home of the victim, could be travelled in 30 to 35 minutes. It is possible, therefore, that the jury could have accepted the testimony of the alibi witnesses and still have concluded that the defendant committed the crime. The jury was not required to disbelieve the testimony of the alibi witnesses in order to find defendant guilty.

ALLEGED JURY MISCONDUCT

The defendant next alleges that the jury acted improperly in considering a fact not in evidence and in disregarding competent scientific evidence. In support of this contention, the defendant offers the affidavit of the jury foreperson.

The defendant contends that while the jury was considering the validity of the defendant's alibi during deliberations,

one of the jurors allegedly stated that the Builder's Exchange opened at 8:30 a.m. The defendant contends that because there was no evidence to this effect introduced at trial, it was reversible error for that jury to rely upon such a fact.

Alleged jury misconduct must affect a material matter in dispute and must prejudice the complaining party. Nelson v. C & C Plywood Corp. (1970), 154 Mont. 414, 465 P.2d 314; Schmoyer v. Bourdeau (1966), 148 Mont. 340, 420 P.2d 316. Here, the defendant has not alleged, and the record clearly shows, that the time at which the Builder's Exchange opened was not a material fact in dispute, and a new trial is not warranted.

The defendant next alleges that the jury acted improperly in ignoring the testimony of the defendant's physician, Dr. Vermillion, and in relying instead upon the unfounded opinions of some of the jurors. Dr. Vermillion testified that the defendant's medical condition (retrograde ejaculation) made him incapable of ejaculation. The foreperson's affidavit stated that some of the male jurors expressed an opinion during deliberations that a person with retrograde ejaculation would still be capable of emitting some fluid during ejaculation.

Under Rule 606(b), Mont.R.Evid., jury discussions concerning the personal beliefs of the jurors are prohibited from disclosure. This rule prohibits a juror from testifying:

> ". . . as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other jurors' mind or emotions as influencing him to assent or dissent from the verdict or indictment or concerning his mental processes in connection therewith."

The jury's discussion of the effect of retrograde ejaculation, should not be considered as a ground for new trial. Rule 606(b), is designed to insure the right to have a jury deliberate in camera, free from "frivolous and recurrent invasions of that privacy by disappointed litigants." Advisory Committee Note to Federal Rule 606(b). The exceptions stated in this rule are exclusive, and are narrowly construed. Charlie v. Foos (1972), 160 Mont. 403, 503 P.2d 538. They apply primarily to instances of "outside" or "extraneous" influence upon the jury. Defendant has raised nothing in the juror deliberations which fall within an exception to Rule 606(b).

Aside from the fact that the alleged juror misconduct does not fall within a rule which provides relief, the record provides no basis to determine whether the jury rejected the testimony of the expert. In fact, the jury could have accepted the testimony of the victim, who denied telling the police officer that the defendant had ejaculated on her face. If so, the testimony of the expert that defendant suffered from retrograde ejaculation, would not have been a factor in the jurys' decision. Furthermore, instruction no. 3 (offered by the State and not objected to by the defendant) told the jury that it was not bound to accept the opinion of an expert witness as conclusive. If the jury did not accept the testimony of an expert witness, it was at liberty to do so under this instruction.

The diabetic condition of the jury foreperson, does not, under these facts, invalidate the jury verdict. The exceptions to Rule 606(b) on juror deliberations, relate to extraneous prejudicial influences which find their way into the jury room. The courts agree that these exceptions must also be narrowly construed.

The alleged effect of juror's diabetic condition was known only after the jury had returned with its guilty verdict. During preliminary examination of the jurors the jury foreperson did not indicate her diabetes might hinder her performance as a juror. When the jury returned with its verdict, the foreperson was asked whether it had reached a verdict. She replied "yes;" and the jury was then individually polled. She, as well as the other jurors, stated that the verdict was her verdict. Again, she gave no indication that her diabetic condition had compelled her to change her vote.

It is also possible that her condition may not have been as critical as the defense claims. The bailiff at the trial testified at defendant's motion for a new trial, and she testified as to her observations of the jury foreperson. The bailiff accompanied the foreperson and other jurors to dinner before the jury had reached a verdict. The foreperson sat next to her at dinner, and talked to other jurors while eating. She had received her insulin and gave the bailiff no indication that she was in distress or incapable of continuing deliberations after dinner.

The great weight of case law and commentaries on this issue, indicates that a juror's physical, mental, and emotional condition is inherent in the verdict. The effect that such condition may have on an individual juror's vote is within the prohibition of Rule 606(b). In Mueller, Jurors Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b), 57 Neb.L.Rev. 920 (1978), the author's survey of the law concludes that juror statements that they compromised their honest convictions due to "personal matters" in order to end deliberations, falls squarely within the prohibition of Rule 606(b).

-10-

Courts have held that the mental and emotional processes of the jurors cannot be considered as a basis for retrial, even if such mental processes are the result of a physical illness. Rather, it is the juror's duty to bring his or her condition to the attention of the court before a verdict is reached.

For example, in State v. Forsyth (Wash. 1975), 533 P.2d 847, the criminal defendant moved for retrial due to the alleged misconduct of a juror in remaining on the jury when her illness rendered her incapable of continuing. The juror's affidavit stated that she was uncomfortable and distracted throughout the trial and deliberations. She further stated that, were it not for her illness and pressure from other jurors, she would not have voted for conviction. The Washington Court stated flatly that ". . . the effect of the jurors illness and the claimed pressure by other jurors may not be used to impeach that verdict." 533 P.2d at 851. The court reasoned that the effect of illness on a juror's vote inheres in the verdict, and is not subject to impeachment. Other state courts have adhered to this view, stating that the effect of fatigue, illness, or exhaustion on the jury deliberations cannot be used to impeach the verdict. Jones v. State (Okla. 1976), 554 P.2d 62; Gafford v. State (Alaska 1968), 440 P.2d 405; West v. State (Alaska 1966), 409 P.2d 847.

We therefore hold that the effect of the foreperson's diabetes upon her mental processes during deliberation falls within the prohibition of Rule 606(b).

The judgment of the District Court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____


_____


_____
Justices

Mr. Justice John C. Sheehy will file his written dissent
at a later time.

-12-