JUSTICE ERDMANN
delivered the Opinion of the Court.
David Girard Kelman appeals from the judgment and sentence entered by the Twelfth Judicial District Court, Hill County, on a jury verdict finding him guilty of the felony offense of tampering with public records or information. We affirm.
The issues on appeal are as follows:
*255 1. Was there sufficient evidence to support the jury verdict?
2. Did the District Court err when it denied Kelman’s motion for a new trial based on alleged juror misconduct?
FACTS
Kelman is a principal owner of Big Ten Electronics (BTE), a corporation that manufactures and distributes video gambling equipment. He is also the managing partner of American Music, a business which places gambling machines, jukeboxes, and pinball machines in various establishments throughout Montana. In the fall of 1991, after discovering an opportunity to purchase and remodel a gambling casino located in Havre, Kelman purchased the property and obtained a liquor license for the establishment which was named Boxcars Casino.
A1 Ransome, a Louisiana resident, and his partner, Joe Terrell, formed a Louisiana corporation called Gaming Management, Inc. (GMI) in 1991 to become involved in the video gambling business in Louisiana. They intended to file an application for a Louisiana video gambling license and hoped to become a distributor in Louisiana for video poker machines. Ransome hired two individuals, Dick Odom and John Marley, to assist him in the business venture, and in 1991 Odom and Marley contacted Kelman to discuss opportunities for distributing BTE video gambling machines in Louisiana.
Sometime between September and November 1991, Marley and Odom informed Ransome of the opportunity to become involved in the Boxcars business venture. The proposal was that Ransome’s corporation would put up half the cost of purchasing and remodeling the building and securing the liquor license and in return Kelman and GMI would become 50/50 partners in Boxcars. The conditions to finalizing the partnership were payment of GMI’s share of the capital contribution, the signing of a partnership agreement, and approval by the State of Montana of GMI’s involvement in the project.
In November 1991 Kelman’s attorney, Matt Robinson, presented Ransome with a written partnership agreement. Ransome made two amendments to the agreement, reran it on his computer, and signed it. Ransome testified that when he inquired of Robinson when Kelman would sign the agreement he was told that in order to avoid delay in obtaining the gambling license, the agreement would be signed after the business was open and GMI’s share of the money had been paid. Nevertheless, Ransome testified that “the agreement was there between us, and I trusted the agreement.”
*256 Kelman would periodically send Ransome a list of expenditures related to Boxcars and Ransome would send money covering half of the expenses. On December 24,1991, Ransome sent Kelman a check for $25,000 with a notation stating “reimbursement for Boxcar’s [sic], Havre, Montana Gaming Mgt.” Ransome wire transferred $25,000 to Kelman on January21,1992, $20,000 on March 20,1992, and $20,000 on April 15, 1992, for a total of $90,000. Ransome made no further advances after April 15, 1992. The funds were deposited into a bank account in Kelman’s name at the First Bank in Great Falls. The account was used primarily for the Boxcars venture and Kelman testified that “every penny” sent by Ransome had been spent at Boxcars.
On January 31, 1992, the Gambling Control Division of the Montana Department of Justice (the Division) received an application from Kelman for a gambling operator’s license. The application was prepared and signed by Robinson as Kelman’s attorney. John Flynn, a revenue agent with the Division, reviewed the application and determined that the information provided was incomplete. Flynn was specifically concerned about where the money to finance the business was coming from and whether Kelman was receiving funds from noninstitutional sources.
On March 18, 1992, Flynn and his supervisor met with Kelman and Robinson to discuss the application and the Division’s concern over noninstitutional lenders. On March 23, 1992, the Division received an NIL (noninstitutional loan) report form in which Kelman reported two noninstitutional loans — one from American Music for $60,000 and one from BTE for $75,900. By March 20, 1992, Kelman had received $70,000 from Ransome for the Boxcars project.
At the time the NIL reporting form was submitted, Kelman resubmitted his application for a gambling operator’s license since the original four-page application had been revised into a longer six-page form. The new application was signed by Robinson on Kelman’s behalf. Section E of the application indicated that no other person or entity had any financial interest or derived income from the business. Section N of the application required Kelman to provide creditor information for each outstanding loan and/or financial obligation (institutional/personal/other) obtained or used for operating the business. Kelman reported two loans from the First Bank in Great Falls, one for $60,000 and one for $80,000. No information was provided concerning the $70,000 financial obligation to Ransome.
*257 Flynn sent the application to Rick Losleben, an investigator with the Gambling Investigations Bureau of the Montana Department of Justice, to verify the information. On April 27, 1992, Losleben and Kelman met to discuss the application. By this time, Kelman had received $90,000 from Ransome. Losleben asked Kelman for additional information about the loans to Boxcars from American Music and BTE. After Losleben and Kelman reviewed the application and Kelman made some changes to the document, Kelman signed the application.
During the course of the meeting, Losleben filled out a standard investigation report which Kelman also signed. In Section C of that report, Kelman was asked who had invested in Boxcars. Kelman listed loans from First Bank of Great Falls, American Music, and himself. In Section D Kelman indicated no one had any right to share in the profits or had an obligation for business liabilities relating to the gambling or liquor operations of the business. Section K required Kelman to list the amount and sources of all financing for the business and list all loan agreements. Kelman listed loans received from BTE, American Music, and First Bank of Great Falls. He did not list the $90,000 which by then he had received from Ransome and spent on the Boxcars project. After the meeting Losleben forwarded the information to the Division and a gambling license was issued to Kelman. Boxcars Casino opened for business on June 24', 1992.
During a trip to Montana in August 1992, Ransome discovered that Montana law would prevent a nonresident from becoming a 50/50 partner in the Boxcars operation. Ransome testified that at that point in time he considered the money he had sent to Kelman to be a loan which he expected Kelman to repay once the business was up and running.
In May 1992 Ransome had applied for a video gambling operator’s license in Louisiana and informed Louisiana authorities he had an interest in the Boxcars operation. In September 1992 Losleben received material from a Louisiana state trooper regarding Ransome’s application for the Louisiana license and his stated involvement with Boxcars. In the summer of 1993, Losleben met with Ransome in Baton Rouge to discuss the situation and, as a result, Losleben identified the bank account into which the funds from Ransome to Kelman had been deposited. This was the first information Montana authorities received concerning the funds provided by Ransome for the Boxcars project.
*258 On May 25,1994, Kelman was charged with two counts of tampering with public records or information pursuant to § 45-7-208, MCA, based upon his failure to disclose the funds received from Ransome on his application to the Division. Kelman entered pleas of not guilty to both counts. On November 18, 1994, the District Court granted Kelman’s motion to merge the two counts into one count. On November 28 through 30, 1994, Kelman was tried before a jury which returned a guilty verdict. On December 22, 1994, Kelman filed a motion for a new trial based on alleged juror misconduct. On January 4, 1995, the District Court denied the motion and sentenced Kelman to one year and one day in the Montana State Prison together with a fine of $35,000 plus a ten percent surcharge. The District Court suspended the entire prison sentence. This appeal followed.
ISSUE 1
Was there sufficient evidence to support the jury verdict?
When the issue on appeal in a criminal case is whether there was sufficient evidence to support a jury verdict, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Licht (1994), 266 Mont. 123, 131, 879 P.2d 670, 675 (citing State v. Lyons (1992), 254 Mont. 360, 363, 838 P.2d 397, 399).
Section 45-7-208, MCA, defines the offense of tampering with public records or information as follows:
(1) A person commits the offense of tampering with public records or information if he:
(a) knowingly makes a false entry in or false alteration of any record, document, legislative bill or enactment, or thing belonging to or received, issued, or kept by the government for information or record or required by law to be kept by others for information of the government;
(b) makes, presents, or uses any record, document, or thing knowing it to be false and with purpose that it be taken as a genuine part of information or records referred to in subsection (1)(a); or
(c) purposely destroys, conceals, removes, or otherwise impairs the verity or availability of any such record, document, or thing.
(2) A person convicted of the offense of tampering with public records or information shall be imprisoned in the state prison for *259 any term not to exceed 10 years or be fined an amount not to exceed $50,000, or both.
Kelman argues that he acted in good faith and on the advice of his counsel. He maintains that Robinson completed the application form and Losleben completed the investigation report. Thus, Kelman claims he did not knowingly falsify the information contained in the application documents. He claims he made an honest effort to comply with the requirements of the application which he contends were confusing and ambiguous.
Kelman goes on to argue that the funds sent by Ransome were personal in nature and that Flynn and Losleben indicated they were not interested in knowing the source of the funds he was personally investing in the business. Kelman further claims that at the time the application forms were submitted neither his partnership with Ran-some nor a loan agreement had been consummated. Thus, he claims he was put into a “Catch-22” situation in that the funds could not properly be characterized as either an investment in the business or a loan obligation.
The State argues that there was sufficient evidence presented at trial of every element of the crime, including the requisite mental state necessary to convict Kelman. The State contends that the $90,000 Kelman received from Ransome was either an investment in Boxcars or a financial obligation of the business, which in either case should have been reported on the application and investigation report. The State maintains that Kelman’s contention that the loan was “personal” rather than a loan of money for the Boxcars business venture is not credible and raises the inference that he was not telling the truth about how the $90,000 was omitted from the application materials.
The jury was instructed that the existence of a mental state may be inferred from the acts of the accused and the facts and circumstances connected with the offense. Section 45-2-103(3), MCA. The jury was presented with evidence concerning Kelman’s acts and the circumstances surrounding the case.
Although Robinson initially signed the gambling operator application form, he testified that at that point in time he was not aware that Kelman had received money from Ransome for the Boxcars project. When Flynn and his supervisor met with Kelman and Robinson in March 1992, Flynn explained the definition of a noninstitutional source of funding. Flynn sent Kelman a follow-up letter after the meeting emphasizing the importance of disclosing noninstitutional *260 funding. When Kelman completed the NIL form later that month he indicated he had received two noninstitutional loans, one from American Music and one from BTE. He failed to disclose the $70,000 he had already received from Ransome.
By the time Kelman met with Losleben, Kelman had received $90,000 from Ransome. Losleben and Kelman together reviewed the pending application and the investigation report. Losleben filled out the report but Kelman acknowledged he was present at the time and read through the document before he signed it. Both forms clearly indicated above the signature lines that the information was true and correct and that false information could result in denial of the license and criminal prosecution. Nowhere on either the application form or the investigation report did Kelman disclose the funds received from Ransome. At no point during his conversations with Flynn or Losleben did Kelman mention the Louisiana funding for the project.
Kelman claims he did not list the Ransome money because he and Ransome had not yet executed a formal partnership or loan agreement. However, the record indicates that Ransome sent the money to Kelman specifically for the Boxcars project and that the money went directly into an account used to pay for Boxcars’ expenses. Kelman nevertheless made a conscious choice not to disclose to the Division the funds sent by Ransome when disclosure of such noninstitutional funding sources was required.
The jury did not find credible Kelman’s contention that Ransome’s money was neither an investment in Boxcars nor a loan for the business venture. We have stated that the credibility of witnesses and the weight to be assigned to their testimony are to be determined by the trier of fact and disputed questions of fact and credibility will not be disturbed on appeal. State v. Graves (1995), 272 Mont. 451, 457, 901 P.2d 549, 553. The jury decides the facts and who to believe. Graves, 901 P.2d at 553.
We conclude, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We hold that sufficient evidence existed to support the jury verdict, and therefore, affirm the District Court on this issue.
ISSUE 2
Did the District Court err when it denied Kelman’s motion for a new trial based on alleged juror misconduct?
*261 We review a district court’s denial of a motion for a new trial to determine whether the district court abused its discretion. State v. Mummey (1994), 264 Mont. 272, 276, 871 P.2d 868, 870. Absent an abuse of discretion the district court’s decision concerning whether or not to grant a motion for a new trial will be affirmed. State v. Hatfield (1995), 269 Mont. 307, 310, 888 P.2d 899, 901.
Kelman moved for a new trial on the ground that the jury was exposed to extraneous prejudicial information. Kelman attached to his motion an affidavit from one of the jurors stating that during deliberations another juror stated that “she believed that David Kelman owned the Playground Bar in Great Falls, Montana.” Kelman alleges that the Playground Bar is a strip bar with a bad reputation. The affiant stated that it appeared the comment was made to make Kelman look bad. The District Court considered the juror affidavit but denied the motion for new trial reasoning that the juror statement was not material to Kelman’s guilt or innocence and that insufficient evidence existed to show that the conviction was related to the alleged remark.
Rule 606(b), M.R.Evid., provides that a juror may not testify as to what occurred during the jury’s deliberations except when the information pertains to: (1) whether extraneous prejudicial information was improperly brought to the jury’s attention; (2) whether any outside influence was brought to bear on any juror; or (3) whether any juror was induced to assent to any verdict or finding by resort to the determination of chance. Kelman argues that the juror statement was extraneous prejudicial information properly received under Rule 606(b)(1), M.R.Evid.
Kelman contends that the initial jury panel vote was 6-6 but that sometime after the comment was made the panel vote was 9-3 in favor of a guilty verdict. He maintains that the statement was inherently prejudicial given the “generally sleazy image” of strip clubs and concludes that “many jurors would assume that a strip club owner is likely to be a person who would intentionally mislead governmental regulatory authorities.” He argues that “the jury herein was comprised almost exclusively of women, likely to have an unfavorable opinion of strip clubs no matter how honest or lawful their operation.” Kelman argues that the jury statement amounted to juror misconduct sufficient to require a new trial.
The State counters that the alleged statement was an internal influence and therefore does not fall within one of the three exceptions set forth in Rule 606(b), M.R.Evid. The State further argues that even *262 if the statement was extraneous information, the information was not prejudicial to Kelman and the District Court did not abuse its discretion in denying the motion for new trial.
In State v. Brogan (1995), 272 Mont. 156, 900 P.2d 284, we held that juror affidavits may not be used to impeach a verdict based upon internal influences on the jury such as a mistake of evidence or misapprehension of the law. Brogan, 900 P.2d at 287 (citing Harry v. Elderkin (1981), 196 Mont. 1, 8, 637 P.2d 809, 813). Where external influence is exerted or external prejudicial information is brought to the jury’s attention, juror affidavits can be the basis of overturning the judgment. Brogan, 900 P.2d at 287. Examples of external influence include a juror’s telephone call obtaining information with regard to previous litigation by the plaintiff, visiting the scene of an accident, or bringing a newspaper article about the trial into the jury room for the jurors to see. Brogan, 900 P.2d at 287 (citing Geiger v. Sherrodd (1993), 262 Mont. 505, 510-11, 866 P.2d 1106, 1109).
We must therefore determine whether the statement was an external or internal influence on the jury. In State v. Hage (1993), 258 Mont. 498, 853 P.2d 1251, among other claims of juror misconduct was the allegation that one juror had informed other jurors that he had personal knowledge that a telephone log was kept of all telephone calls made from the jail. Hage, 853 P.2d at 1256. Citing State v. DeMers (1988), 234 Mont. 273, 762 P.2d 860, we concluded that knowledge and information shared from one juror to another or others is not an extraneous influence. Hage, 853 P.2d at 1257.
Moreover, one of the purposes behind Rule 606(b), M.R.Evid., is to ensure that jurors are able to deliberate free from the frivolous and recurrent invasions of their privacy by disappointed litigants. State v. Maxwell (1982), 198 Mont. 498, 505, 647 P.2d 348, 353. Jurors are expected to bring to the courtroom their own knowledge and experience to aid in their resolution of the case. DeMers, 762 P.2d at 863.
The statement at issue in the present case is a juror’s belief that Kelman owned the Playground Bar. Like the juror’s belief as to the jailhouse telephone log at issue in Hage, we conclude that the statement made in the present case, whether mistaken or not, was an internal influence and within the prohibition of Rule 606(b), M.R.Evid. Even though we hold that the District Court erred in considering the juror affidavit in ruling on Kelman’s motion for a new trial, we conclude the court did not abuse its discretion when it denied the motion. In affirming the District Court on this issue, we rely on *263 our determination that the juror statement was not an external influence subject to the exceptions of Rule 606(b), M.R.Evid.
Affirmed.
CHIEF JUSTICE TURNAGE, JUSTICES GRAY and NELSON concur.