FILED

March 20 2007

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

No. DA 06-0391

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 79

FILED

MAR 2 0 2007

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

WILLIAMS FEED, INC., a Montana corporation,
KIM F. WILLIAMS and SHARON WILLIAMS,

        Plaintiffs and Appellants,

    v.

STATE OF MONTANA, DEPARTMENT
OF TRANSPORTATION,

        Defendant and Respondent.

---

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Beaverhead, Cause No. DV-05-12787
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Wade J. Dahood, Bernard J. "Ben" Everett; Knight, Dahood,
Everett & Sievers, Anaconda, Montana

    For Respondent:

        Edward G. Beaudette, Lyle Manley, Special Assistant Attorneys
General, Montana Department of Transportation, Helena, Montana

---

Submitted on Briefs:  December 20, 2006

Decided:  March 20, 2007

Filed: _____
             Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Williams Feed, Inc., Kim F. Williams, and Sharon Williams (collectively the Williamses) appeal from the order of the Fifth Judicial District Court, Beaverhead County, denying their motion for judgment as a matter of law or a new trial. We affirm the District Court.

¶2 We state the issues as follows:

¶3 1. Was the evidence sufficient to support the jury verdict in favor of the State of Montana Department of Transportation (Department)?

¶4 2. Did the District Court abuse its discretion in denying the Williamses' motion for a new trial alleging jury misconduct?

¶5 3. Did the District Court abuse its discretion in excluding from evidence three right-of-way agreements between the Department and other property owners abutting North Montana Street?

¶6 4. Did the District Court abuse its discretion in excluding testimony from the Dillon Chief of Police?

**BACKGROUND**

¶7 Kim and Sharon Williams owned and operated Williams Feed, Inc., in Dillon, Montana, and Sheridan, Montana. Three of the buildings the Williamses owned and used for their business were located on North Montana Street in Dillon. The land was leased from the

Union Pacific Railroad Company. The Williamses' fertilizer plant, located in one of the buildings on North Montana Street, was the lifeblood of the business.

¶8 In November of 2002, the Montana Transportation Commission adopted a resolution that established limited access control on the west side of a four-block section of North Montana Street, including the Williamses' property. The plan included installing curbs along the street with curb cuts to access the properties. In the initial phase of construction, the Williamses negotiated with the Department to make adjustments to the size and location of the curb cuts that allowed access to their property. The Williamses assured Department representatives that their business would not be negatively impacted by the highway project. The construction project began in April of 2004 and was completed in October of 2005.

¶9 On January 10, 2005, the Williamses filed an action for inverse condemnation. They alleged that the limited access designation amounted to a taking because it denied the Williamses reasonable access to their property. Prior to reconstruction, fertilizer trucks were able to access the property anywhere along the street. The surface surrounding the plant was dirt and gravel, which was level with the edge of the asphalt on the street. The reconstruction made access available only through forty-foot and fifty-foot wide curb cuts. Further, prior to reconstruction, truck drivers were able to use the width of North Montana Street to maneuver their trucks into the plant's receiving area. After the street was designated a limited access highway, truck drivers were no longer able to make such maneuvers on the street. The Williamses alleged that fertilizer trucks were no longer able to make deliveries because the trucks did not have room between the plant's receiving area and the curb to stay off the

3

street. The fertilizer plant ceased operations in June 2004, and Williams Feed, Inc., shut down entirely in December 2004.

¶10 Prior to trial, the court determined that the only issue to be decided by the jury was whether the Williamses were denied reasonable access to their property. Reasonable access was defined as free and convenient access.

¶11 The Williamses' proposed trial exhibits included right-of-way agreements made between the Department and three other property owners, all agricultural businesses along North Montana Street, that were impacted by the same project. The District Court excluded the documents as being irrelevant. The District Court also excluded an affidavit the Williamses obtained from Dillon Chief of Police John Gutcheck regarding the legality of maneuvering trucks on North Montana Street.

¶12 At trial, both sides introduced evidence as to whether the Williamses had been denied reasonable access to their property. The Williamses' main contention was that delivery trucks could no longer access the property to make deliveries, and without deliveries, they could not conduct their fertilizer business. Kim Williams testified as follows: Prior to reconstruction, trucks could pull in anywhere along approximately 575 feet of road in front of the fertilizer plant. Although the area was often congested with their own equipment and other delivery trucks, the fertilizer trucks could maneuver safely without encroaching onto the street because there was no curb. The gravel in front of the building made it easier to maneuver a large truck. After reconstruction, much of the area in front of the plant was asphalt, which was harder to turn on because the truck tires would grab. This newly paved

4

area—from the boundary of the plant property to the curb—was considered a truck frontage road, which was thirty-two feet nine inches wide. There was a six inch drop from the frontage road curb to the actual street. The new construction created a problem because drivers could not safely get trucks off the street through the narrow curb cuts without running over the curb. Running over the curb was illegal and could damage the delivery equipment.

¶13 William Wehri, the manager at the fertilizer plant testified that the plant would receive deliveries by trucks ranging from sixty-five to one hundred feet in length. He further testified as follows: The usual delivery trucks were Super B and A Train trucks, which were a combination of a tractor, a main trailer, and a pup trailer. The plant had the ability to receive deliveries pneumatically by blowing product from the truck through a hose into the delivery plant. Use of the pneumatic system, however, blocked access for other trucks trying to load mixed fertilizer and service customers. Unloading product pneumatically cost approximately $2.60 more per ton. The plant had the pneumatic delivery system in place for several years prior to the start of the road reconstruction. However, Kim Williams had testified that some of the products could not be delivered pneumatically because it would ruin the product. Wehri stated that they could request delivery of the product in a specific type of truck and trailer combination. He also testified that the combination trucks could be unhooked and the pup trailer could be pushed into the receiving area with a power unit.

¶14 The Williamses introduced a video of a truck driver, Gary Rude, failing in his attempts to back his fertilizer truck into the receiving area of the fertilizer plant. Jerry Hillier, another truck driver involved in the video demonstration, testified that he had delivered products to

5

Williams Feed approximately ten to fifteen times per year prior to reconstruction. He stated that prior to reconstruction, there was enough room in front of the fertilizer plant to allow him to jackknife the entire trailer and pup into position to deliver the load. Hillier testified that after reconstruction, there was no longer enough room to deliver the load while staying off the street and keeping the tires from running off the curb. The truck used in the Williamses' demonstration was sixty-eight feet long.

¶15 The Department also introduced a video of one of its employee truck drivers, Russ Sutton, attempting to back a truck into the receiving area of the fertilizer plant. During the demonstration, Sutton was driving a belly dump tractor with a single trailer, with a total length of 66.5 feet. He practiced about ten times at the Department yard in Dillon before attempting the maneuver at Williams Feed. He entered onto the Williamses' property through one of the curb cuts. His first attempt to back into the receiving area failed because he did not cut sharp enough and could not line up with the receiving area ramp. He went around the block and came back for a second try. He was able to back into the receiving area successfully with a spotter and without driving over the curbs. Sutton tried a third time and was able to back in then as well. The truck he was driving had a back window, although he testified that he did not use it. Sutton stated that he had driven fertilizer trucks in the past, and he felt that he could have successfully backed in the truck driven by the driver in the Williamses' demonstration video. He admitted that having more pivot points would make the backing maneuver more complicated. When driving off the Williamses' property and

turning back onto North Montana Street, Sutton stated his tire hit the slope of the curb cut, but that he could have avoided that if he had moved his truck more to one side.

¶16  The jury determined that the Williamses had not been denied reasonable access to their property. The Williamses filed a motion for judgment as a matter of law or a new trial. The Williamses argued that there was insufficient evidence to support the jury verdict. They also argued that a new trial was warranted because of juror misconduct. Finally, the Williamses alleged that the court erred when it excluded the right-of-way agreements and Chief Gutcheck's affidavit. The District Court denied the Williamses' motion for judgment as a matter of law or a new trial. The Williamses appeal.

## STANDARD OF REVIEW

¶17  We will not reverse the district court's denial of a motion for a new trial absent a manifest abuse of discretion. *Hoffman v. Austin*, 2006 MT 289, ¶ 13, 334 Mont. 357, ¶ 13, 147 P.3d 177, ¶ 13. The standard of review of a district court's refusal to grant a new trial based on a claim of insufficient evidence is whether substantial credible evidence supports the jury's verdict. It is within the province of the jury to determine the credibility of witnesses and the weight of the evidence. We view the evidence in the light most favorable to the prevailing party. *Hoffman*, ¶ 13.

¶18  A district court's ruling on the admissibility of evidence is reviewed to determine whether the court abused its discretion. A court abuses its discretion if it "acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason." *Faulconbridge v. State*, 2006 MT 198, ¶ 22, 333 Mont. 186, ¶ 22, 142 P.3d 777, ¶ 22.

## DISCUSSION

¶19     **ISSUE 1: Was the evidence sufficient to support the jury verdict in favor of the Department?**

¶20     The Williamses assert that there was no substantial credible evidence presented by the Department to establish that the Williamses still had free and convenient access to their property on North Montana Street. They argue that the Department had the burden of proving that fertilizer trucks of all sizes had free and convenient access to the property through curb cuts. However, the only issue submitted to the jury was whether the Department's action in establishing North Montana Street as a limited access highway and building curbs and curb cuts deprived the Williamses of reasonable access, which was defined as free and convenient access.

¶21     The Williamses point to evidence demonstrating that it was difficult for large trucks to back into the plant's receiving area without encroaching on the street, and that the tires would run off the curbs. The Department, however, presented evidence that a 66.5 foot long truck could access the receiving area through the curb cuts without falling off the curb. The jury heard testimony that larger truck-trailer combinations could be unhooked to make them shorter, and a power unit could push the trailers into the receiving area. The jurors also heard that the plant was set up for pneumatic delivery and, although it was more expensive, Williams Feed could receive almost all its products in this manner. The former plant manager testified that he could request delivery of product in any size truck or trailer combination he wanted.

8

¶22 We conclude that there was sufficient evidence to uphold the jury's verdict. This Court will uphold a verdict if supported by substantial credible evidence. "Substantial evidence may be weak or conflicting, but must be greater than trifling or frivolous." *Moore v. Beye*, 2005 MT 266, ¶ 15, 329 Mont. 109, ¶ 15, 122 P.3d 1212, ¶ 15 (citing *Barrett v. Asarco Inc.*, 245 Mont. 196, 200, 799 P.2d 1078, 1080 (1990)). The Department presented evidence that trucks could access the property through the curb cuts. Although the Williamses provided evidence to the contrary, "it is not this Court's function to agree or disagree with the verdict." *Moore*, ¶ 15. The jury weighed the testimony and the credibility of the witnesses and determined that the Williamses had reasonable access to the property.

¶23 We affirm the District Court's denial of a new trial on this issue.

¶24 **ISSUE 2: Did the District Court abuse its discretion in denying the Williamses' motion for a new trial alleging jury misconduct?**

¶25 The Williamses allege jury misconduct occurred when a juror who had observed a truck servicing a business, Standard Lumber, on North Montana Street reported his observations to the rest of the jury. The Williamses provided affidavits from jurors in support of their argument. Jurors Breanne Smith and Jack McKey stated in affidavits that another juror, Kelly Bockting, told the jury during deliberations that "[s]ince trucks servicing Standard Lumber had no trouble in doing so, the same should apply to Williams Feed...." Bob Brandbo, an owner of Standard Lumber, provided his own affidavit stating that all trucks that service that business do so on side streets and never on North Montana Street. The Department obtained an affidavit from Bockting in which he acknowledged that while

9

he was returning to the courthouse after lunch, he had seen a semi truck turning into the North Montana Street entrance of Standard Lumber. He stated that the observation was happenstance in the course of returning to the courthouse by his normal route. He stated that, in response to another juror's question about drivers needing assistance from spotters, he "mentioned the fact that [he] had just recently seen a truck pull into the Standard Lumber Company from North Montana Street and that it was [his] belief that that truck would have to back out onto North Montana Street once it was unloaded and that they would probably need a spotter or guidance to do so." Other jurors, Bradley Gillespie and Shawn Ward, provided affidavits stating that they heard Bockting make such a statement, that it came late in deliberations, and that one vote of nine to three in favor of the Department had already been taken. They did not believe this comment had any additional influence on any of the other jurors.

¶26 The Williamses contend that the statement made by Bockting was extraneous prejudicial information. They argue that Bockting conducted an improper independent investigation. The Department contends that the information provided by Bockting was an internal influence and not a proper subject for affidavits under M. R. Evid. 606(b).

¶27 The Williamses also allege jury misconduct occurred when a jury member mentioned that a verdict for the Williamses would mean spending tax dollars. Juror Smith's affidavit states that it was mentioned that any "settlement" would involve spending taxpayer dollars. McKey's affidavit is silent on the issue, and Bockting, Gillespie and Ward all stated in their affidavits that they had no recollection of taxes being mentioned.

10

¶28 M. R. Evid. 606(b) provides that a juror may not testify as to what occurred during a jury's deliberations except when the information pertains to: (1) whether extraneous prejudicial information was improperly brought to the jury's attention; or (2) whether any outside influence was brought to bear upon any juror; or (3) whether any juror has been induced to assent to a verdict or question by a resort to the determination of chance. *State v. Kelman*, 276 Mont. 253, 261, 915 P.2d 854, 859 (1996). Juror affidavits "may not be used to impeach a verdict based upon internal influences on the jury such as a mistake of evidence or misapprehension of the law." *Kelman*, 276 Mont. at 262, 915 P.2d at 860 (citing *State v. Brogan*, 272 Mont. 156, 161, 900 P.2d 284, 287 (1995)). However, where "external influence is exerted or external prejudicial information is brought to the jury's attention, juror affidavits can be the basis of overturning the judgment." *Kelman*, 276 Mont. at 262, 915 P.2d at 860 (citing *Brogan*, 272 Mont. at 161, 900 P.2d at 287). External influence may include a juror making a telephone call to obtain information about a party's previous litigation, visiting the scene of an accident, or bringing a newspaper article about the trial into the jury room, *Kelman*, 276 Mont. at 262, 915 P.2d at 860 (citing *Brogan*, 272 Mont. at 161, 900 P.2d at 287). Extraneous influence does not include knowledge and information shared by one juror with the others. *Kelman*, 276 Mont. at 262, 915 P.2d at 860. In fact, jurors are expected to bring their own knowledge and experience to the courtroom to aid in the resolution of the case. *Kelman*, 276 Mont. at 262, 915 P.2d at 860. A statement by a juror that he had personal knowledge that a log was kept of all telephone calls made from the jail was held to be an internal influence. *State v. Hage*, 258 Mont. 498, 508, 853 P.2d 1251,

11

1257 (1993). A juror's statement that he thought the defendant owned a disreputable business, whether mistaken or not, was also held to be an internal influence. *Kelman*, 276 Mont. at 262, 915 P.2d at 860.

¶29 Likewise, the mental processes of jurors are internal influences and are thus not subject to impeachment under M. R. Evid. 606(b). *Hage*, 258 Mont. at 508, 853 P.2d at 1257 (citing *State v. DeMers*, 234 Mont. 273, 277, 762 P.2d 860, 863 (1988)). "A juror's physical, mental, and emotional condition is inherent in the verdict, and the effect of such a condition on a juror's vote is within the prohibition of Rule 606(b)." *Hage*, 258 Mont. at 508, 853 P.2d at 1257 (quoting *DeMers*, 234 Mont. at 277, 762 P.2d at 863); *see also State v. Maxwell*, 198 Mont. 498, 507, 647 P.2d 348, 353-54 (1982).

¶30 With regard to Bockting's statement, we must determine if the statement was an external or internal influence on the jury. *Kelman*, 276 Mont. at 262, 915 P.2d at 860. The statement at issue is Bockting's comment that he observed a semi truck entering a business on North Montana Street. Bockting made the assumption that, if that truck could service Standard Lumber, then trucks should also be able to service Williams Feed. The Williamses allege that he obtained this information by an independent investigation, which, they note, is defined as a close examination or systematic inquiry. *Mirriam Websters Collegiate Dictionary* 616 (10th ed., 1993). We conclude that the information that Bockting relayed to the jury derived, not from an independent investigation, but from a casual and perhaps mistaken observation. Bockting's statement, like the statements at issue in *Hage* and

*Kelman*, amounts to one juror sharing information with other jurors. Such sharing of information does not constitute an external influence on the jury under M. R. Evid. 606(b).

¶31 We must also determine if the statement made by an unidentified juror that any verdict in favor of the Williamses would mean spending taxpayer dollars is an internal or external influence on the jury. We conclude this statement amounts to an opinion expressed by a juror as part of his or her mental process in deliberations. The effect of such an opinion inheres in the verdict and is not subject to impeachment.

¶32 The District Court did not abuse its discretion in denying the Williamses' motion for a new trial based on jury misconduct.

¶33 **ISSUE 3: Did the District Court abuse its discretion in excluding from evidence three right-of-way agreements between the Department and other property owners abutting North Montana Street?**

¶34 The Williamses argue that the three right-of-way agreements the District Court excluded from evidence were statements against interest pursuant to M. R. Evid. 801(d)(2). The agreements demonstrated that the Department compensated three other agricultural business owners in the reconstruction zone. The Williamses intended to introduce them for the purpose of showing the similarity between the properties that were affected and the Williamses' property. The agreements arguably would show that the Department recognized the highway project impaired access to other businesses, which were also on leased railroad land.

¶35 In reviewing the right-of-way agreements, it is apparent that the Department and the other business owners negotiated over issues such as the size and placement of curb cuts, placement of lamp posts and traffic lights, the removal of sidewalks, and adequate parking for customers. When access could not be fully addressed, the Department compensated these businesses for such items as the cost of removing structures and returning the property back to pre-lease condition pursuant to the lease with the railroad, moving an entrance to a building, redesigning and building a loading dock, and removing an office building. Other than negotiating for larger curb cuts, there is nothing in the record to indicate that the Williamses attempted to address concerns similar to those expressed by the other businesses in their negotiations with the Department.

¶36 The Department argued, and the District Court agreed, that the agreements were not relevant to the issue before the jury. M. R. Evid. 401. The District Court stated in its order that "[p]roof of taking of access from one parcel does not prove a taking of access from a separate distinct parcel." The court noted the well accepted principle of real estate law that each parcel of land is distinct based upon its geographic location. Thus, the court concluded that the question of whether reasonable access for a specific parcel has been denied must be based upon the merits of that specific parcel, and not differently situated parcels. The determination of whether there is adequate access to property hinges on the specific geography of the site. For example, the size of the parcel, the location of structures on the property, access into the structures themselves, the surrounding streets, the size of curb cuts, the minute details of placement of lamp posts, traffic lights, sidewalks, and even ground

14

coverings, all affect how property may be accessed. The right-of-way agreements in this case demonstrate the Department's negotiations and settlements with property owners based on the uniqueness of each piece of property.

¶37 The District Court did not abuse its discretion when it concluded the right-of-way agreements were not relevant in determining whether the Williamses were denied reasonable access to their specific parcel of land.

¶38 **ISSUE 4: Did the District Court abuse its discretion in excluding testimony from the Dillon Chief of Police?**

¶39 The Williamses obtained an affidavit from the Dillon Chief of Police, John Gutcheck, in support of a motion for summary judgment. In their motion, the Williamses relied on the affidavit to support their contention that the "reason the Williams are no longer able to access their property is because trucks can no longer block traffic on North Montana Street. The designation of North Montana Street as a limited access control highway prohibits that practice." In his affidavit, Chief Gutcheck stated that, as a result of reconstruction, trucks entering businesses along the reconstructed area of North Montana Street would no longer be able to use the width of the street to maneuver, stop, and park as they had in the past. Chief Gutcheck stated that such maneuvering would be a violation of the law and drivers would be subject to citation. Attached to Chief Gutcheck's affidavit was a report which detailed the Chief's response to a call from Kim Williams who wanted assistance in blocking traffic on North Montana Street so that a truck could back into the plant. According to the report, Chief Gutcheck told the Williamses and the truck driver that traffic lanes could not be

15

blocked, and that if drivers were to interfere with traffic while backing onto the street or violate restrictions on the controlled access highway, the drivers would be ticketed.

¶40 In response to the affidavit obtained by the Williamses, counsel for the Department filed their own affidavit, stating they interviewed Chief Gutcheck, and he told them that such maneuvering across the width of the street was always illegal, but that it would now be enforced because the city no longer wished to have trucks backing across the road and blocking traffic. The Department filed a motion to vacate the trial date in order to determine whether Chief Gutcheck's conflicting statements implicated the City of Dillon and others as indispensable parties to the action. The District Court denied the motion to vacate, but ruled that the affidavit would not be considered. The Williamses state that at a hearing, the District Court ruled from the bench that Chief Gutcheck's testimony would not be allowed in the case. The Williamses state that at another hearing, the court again made a bench ruling that the "testimony of Gutcheck as set forth in his affidavit would not be allowed." The motion for summary judgment was denied because there were genuine issues of material fact.

¶41 The pre-trial order listed Chief Gutcheck as a witness. The description of his proposed testimony, according to the Williamses' trial brief, was as follows:

> If permitted to testify he would establish free and convenient access along entire frontage of 515 feet of fertilizer plant prior to the imposition of limited access control. Also, that such access no longer exists now that North Montana Street is a controlled access highway. The maneuvering of fertilizer trucks on North Montana Street to service the fertilizer plant is no longer permitted.

16

On appeal, the Williamses argue that Chief Gutcheck's testimony was relevant to their state of mind because it would have established that they were "officially informed" that fertilizer trucks no longer had access to the plant, and that based on this information, the Williamses shut down their operation.

¶42 There seems to be some confusion as to whether the Chief was wholly prohibited from testifying or whether he was prohibited from testifying regarding the content of his affidavit. The Williamses admitted they did not want to introduce the affidavit. Rather, they wanted Chief Gutcheck's live testimony. The Williamses have not provided the transcripts to any of the hearings where the District Court made bench rulings regarding this issue. We only have the notice of ruling from the hearing on the motion to vacate, where the court stated that the Gutcheck affidavit would not be considered. It is apparent from the District Court's order denying the motion for a new trial, that the court had determined that the Chief could not testify on matters of law. Although Chief Gutcheck was named in each party's witness list, neither party called him as a witness at trial. We cannot fault the court for excluding a witness who was not called to testify.

¶43 There is also a question as to what would have been the purpose of Chief Gutcheck's testimony at trial. In their motion for summary judgment, the Williamses stated his testimony was relevant to show that, after reconstruction, trucks would no longer be allowed to maneuver, stop and park on North Montana Street as they had been allowed to do prior to reconstruction. This testimony, however, would not be relevant to the narrow issue of whether the Department denied the Williamses access to their property. It would merely

17

indicate the Chief's policy with regard to enforcing laws that had been in place before and after reconstruction.

¶44 In their motion for a new trial and on appeal, the Williamses argue that the Chief's testimony was relevant to the Williamses' state of mind; that is, when they were advised by Chief Gutcheck that truckers were no longer allowed to block traffic, they thought that access had been impaired to the point that they could no longer conduct business. Based on this impression, the Williamses shut down their operations. Again, the issue before the jury was whether the Department, as opposed to the City of Dillon, acting through Chief Gutcheck, impaired the Williamses' access. The jury was required to make an objective, factual finding as to physical access. It did not matter that the Williamses were led to believe that, as a legal matter, access had been impaired because Chief Gutcheck would no longer allow trucks to block traffic.

¶45 All questions of law, including the admissibility of testimony and the rules of evidence, must be decided by the court. Section 26-1-201, MCA; *see Stenberg v. Neel*, 188 Mont. 333, 339, 613 P.2d 1007, 1010-11 (1980). The District Court did not abuse its discretion when it prohibited Chief Gutcheck from testifying on matters of law or on matters relating to the Williamses' subjective state of mind.

¶46 We affirm the District Court.

W. William Leaphart
Justice

18

We concur:

_____

_____

_____
Justices

Justice Patricia O. Cotter dissents.

¶47 I dissent from the Court's resolution of Issues 3 and 4. Because I would reverse and remand for a new trial, I would not reach Issues 1 and 2.

¶48 The Williamses argue that the District Court abused its discretion when it excluded from evidence as irrelevant the three right-of-way agreements entered into between the Department and other property owners abutting North Montana Street. I agree. While I cannot fault the Court's reasoning that each parcel of property is unique, and that the access that works for one parcel may not work for another (see ¶ 36), the purported similarity between the parcels was not the sole reason the agreements were offered. As the Court notes at ¶ 34, the Plaintiffs also argued the agreements would arguably show that the Department recognized that its project impaired access to other businesses, and thus—to the extent the Department was arguing in the instant case that no compensable taking had occurred—constituted an admission against interest. However, the District Court did not address this rationale for admission of the exhibit in its order denying admission.

¶49 Evidence is generally admissible if relevant. M. R. Evid. 402. I would conclude that the agreements were relevant to show the Department's acknowledgment that its road work did impair the business access enjoyed by other businesses. The Plaintiffs here conceded that the amount of compensation would not be admissible and that the offer would not be made for purposes of demonstrating comparability of the property values. In *Kiely Construction v. City of Red Lodge*, 2002 MT 241, ¶ 95, 312 Mont. 52, ¶ 95, 57 P.3d 836, ¶ 95, we concluded that admission of evidence of prior settlement

negotiations and the resulting agreement to demonstrate the arbitrary and capricious nature of the City's decision at issue, was not error. Similarly, I would conclude here that the agreements were admissible to support Plaintiffs' contention that the Department was being arbitrary when it argued that their particular way of access—as opposed to that of others—was reasonable and not impaired. The purported distinctions between the properties subject to the right-of-way agreements and Plaintiffs' property, addressed in ¶ 36 of the Court's Opinion, could have been adequately and easily addressed on cross-examination.

¶50 I would also conclude the District Court erred in determining that any testimony from Chief Gutcheck would have been irrelevant. (While I agree with the Court's statement at ¶ 42 that the record on this point is confusing, the District Court did conclude in its order denying Plaintiffs' motion for a new trial that any testimony from the Chief would have been irrelevant.) The Court states at ¶ 43 that the Chief's testimony would not be relevant to the narrow issue of whether the Department denied the Williamses access to their property. I agree. However, the evidence was relevant to demonstrate why Plaintiffs decided to and did go out of business, and to rebut the Department's contention that Plaintiffs' damages were the result of their voluntary termination of their business and not the reconstruction of the street abutting their property.

¶51 In summary, while I agree with the District Court's determination of the sole issue for trial (see ¶ 10), I would conclude the court too narrowly limited the admission of relevant evidence to support Plaintiffs' case and counter the Department's defenses, to

the detriment of Plaintiffs.  I would therefore reverse and remand for a new trial.  I dissent from our refusal to do so.

_/s/ Patricia Cotter_
Justice

22