**STATE of Alaska, Appellant,**

v.

**John TITUS, Appellee.**

**No. A–5639.**

Court of Appeals of Alaska.

March 14, 1997.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Arthur Lyle Robson, Fairbanks, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

A Fort Yukon jury found John Titus guilty of first-degree sexual assault. In the week following this verdict, Titus and a defense investigator interviewed several jurors, asking them why they had voted to convict. Based on these interviews, Titus filed a motion for a new trial in which he asserted that the jurors had improperly considered matters outside the evidence during their deliberations.

Superior Court Judge Mary E. Greene held a hearing on this motion. At this hearing, several jurors testified concerning statements that various jurors had made during deliberations. Based on the testimony of these jurors, Judge Greene concluded that Titus's jury had discussed matters outside the evidence—specifically, the possibility that Titus had been drunk during the episode litigated at his trial, as well as Titus's reputation for committing antisocial acts when he was drunk. Because the jury had discussed these matters, Judge Greene ruled that Titus was entitled to a new trial. The State now appeals Judge Greene's ruling.

The main question presented in this appeal is whether Judge Greene was authorized to receive affidavits and take testimony concerning the details of the jury's deliberations. As we explain in more detail below, we conclude that Alaska Evidence Rule 606(b) barred the superior court from considering the affidavits and the testimony offered at the hearing. Thus, the superior court should have denied Titus's motion for a new trial.

*Facts of the case*

A Fairbanks grand jury indicted John Titus for first-degree sexual assault, AS 11.41.410(a). The crime was alleged to have occurred in the village of Venetie. Under Alaska Criminal Rule 18(e), Titus was entitled to ask the superior court to hold his trial in the locality nearest Venetie that had the facilities to accommodate a felony trial. In Titus's case, that locality was Fort Yukon. *See* Alaska Criminal Rule 18(b) and Alaska Administrative Bulletin 27 (as amended effective December 13, 1993).

Fort Yukon is a town of approximately 750 inhabitants. Titus was well-known in Fort Yukon. At the time of this offense, he was the village chief in nearby Venetie, and he was a member of the Yukon Flats Regional Board of Education. In addition, Titus was a publicly-acknowledged recovering alcoholic who was active in the local Native sobriety movement.

Apparently believing that a Fort Yukon jury would be more favorably inclined toward him than a Fairbanks jury, Titus asked to have his trial held in Fort Yukon. The State opposed this request precisely because Titus was so well-known in Fort Yukon, and for the additional reason that the case had generated significant publicity in Fort Yukon. Over the State's objection, the superior court granted Titus's request.

Jury selection began on March 7, 1994. It lasted almost two days. Of 48 prospective jurors, 21 were excused for cause. Several of the jurors excused for cause indicated that, because of their knowledge of Titus and/or their association with him, they would be biased against the State and would likely not vote for conviction. Titus exercised only seven of the ten peremptory challenges allowed to him under Alaska Criminal Rule 24(d). Of the twelve jurors ultimately selected to try Titus, all but one either knew Titus personally or knew of Titus and had heard about the case prior to trial. Four of the jurors were employees of the local school district. (As noted above, Titus was a member of the regional Board of Education.)

At the end of the first day of jury selection, and again at the end of the second day, the State asked the superior court to move the case back to Fairbanks. The prosecutor argued that a change of venue was required because of the near impossibility of finding jurors who were unfamiliar with Titus, the

witnesses, and the facts of the case. However, Titus reaffirmed his desire to be tried in Fort Yukon, and the superior court refused to change the site of the trial.

The trial itself took little more than one day. The jury found Titus guilty. Titus asked Judge Greene to allow him to remain free on bail for two more weeks so that he could collect the furs from his traplines. Judge Greene granted this request.[1]

While Titus was free on bail, he approached several of the jurors, protested his innocence, and demanded to know why they had voted to convict him. At the same time, an investigator employed by the Public Defender Agency also interviewed several of the jurors, asking them to relate the details of the jury's deliberations and to explain why the jury had voted to convict Titus.

On March 16th, Titus filed a motion for a new trial, alleging jury misconduct. Titus's primary allegation was that "at least two jurors made statements [during deliberations] regarding contacts [they had had] with Mr. Titus outside the courtroom which affected their opinions of him and his credibility".

At the ensuing hearing, three jurors testified. Their testimony focused on the jury's discussion of Titus's use of alcohol and on whether any jurors had expressed fear of Titus when he was drinking. Each of the three jurors gave a different account of the comments made during deliberations.

The first juror to testify was Evelyn James. According to Evelyn[2], a comment about drinking was made during the early part of the deliberations. One of the jurors mentioned that the charged rape had taken place during Venetie's spring carnival. This juror noted that spring carnival was a time when many people drink, and the juror wondered whether Titus had been drinking on

---

1. Under AS 12.30.040(b)(1), a defendant convicted of first-degree sexual assault "may not be released on bail either before sentencing or pending appeal". Judge Greene allowed Titus to remain at large by the expedient of refusing to accept the jury's verdict for two weeks. The judge took this action solely to avoid the effect of the bail statute; no one suggested at that time that there was any potential infirmity in the jury's verdict.

2. We intend no disrespect by the use of Ms. James's first name. As explained later in this opinion, the second of the three jurors called to testify at the hearing also had the last name "James". We therefore are using the jurors' first names to distinguish them.

the night before the incident. Evelyn testified that, when the juror raised this subject,

> we [the other jurors] stopped her[.] . . . [W]e told her that [this issue] was not brought out in court, [so] we couldn't talk about that. And then the lady to the left of me said, "Well, if I was walking down the road and I saw John Titus drinking, coming up the road, I would go on the other side of the road."

Titus's attorney then asked Evelyn whether the juror on the left had meant that she would go to the other side of the street out of fear that Titus would rape her. Evelyn replied that she did not know what this juror had meant—whether she would have crossed the street out of fear or simply out of common-sense avoidance of a drunk person. Evelyn later stated that she interpreted the juror's comment as expressing a common-sense desire to avoid a drunken individual. Evelyn could not recall whether any other jurors had agreed with the one juror's statement about crossing the street to avoid encountering Titus when he was intoxicated.

In addition, Evelyn testified that one of the jurors remarked that they had seen Titus drinking in Fort Yukon before the trial began; however, no one responded to this remark. Evelyn told the court that, aside from these comments, she did not think that there was further mention of Titus's drinking during the jury's deliberations.

The second juror to testify was Vera James. She too recalled a juror saying that she would cross the street to avoid Titus if he were intoxicated. According to Vera, two or three jurors (including herself) agreed with this statement. Vera later explained that she agreed with the statement because an intoxicated person is a "nuisance" and should be avoided.

Vera told the court that "several [jurors] made comments about [Titus's] drinking", and that one of the jurors specifically mentioned seeing Titus drinking on the streets of Venetie and Fort Yukon a few days before trial. Vera also testified that, during deliberations, one juror commented that Titus had been drinking during the period when the incident occurred.

On cross-examination, Vera stated that the comments about Titus's drinking occurred early in the deliberations, and that discussion of this issue ended when one or more of the jurors reminded them all that they should not discuss facts outside the record.

The third juror to testify was Sarah Knudson. She remembered that some jurors made general comments about Titus's drinking. Knudson testified that one juror stated: "If I was on the same road with John Titus and he was drunk, I would go on the other side. If I was on the same side, he would . . . grab me and rape me." Knudson also recalled another juror's agreeing with this statement. Knudson testified that these comments occurred while the jurors were eating their dinner, not during their formal deliberations. She told the court that the comments about Titus's drinking were "attack[s][on] his character when he was intoxicated", and that some jurors remarked on "what a different person [Titus] was when he wasn't involved in alcohol".

Based upon the three jurors' testimony, Judge Greene found that the jury had engaged in misconduct, and she therefore granted Titus's motion for a new trial. Judge Greene found that the jury had discussed "[i]nformation not contained in the trial record"—specifically, "that Titus was drinking extensively" both "at the time of the alleged rape in Venetie and before the trial [in Fort Yukon]". Further, Judge Greene concluded that the votes of one or more jurors were likely influenced by the jurors' discussion of the changes in Titus's behavior when he was intoxicated, and by their discussion of the likelihood that Titus had been drinking at the time of the offense.

*Alaska Evidence Rule 606(b) prohibited the superior court from examining the jurors concerning their discussions of Titus's character, his alcoholism, and the effect that intoxication could have on his behavior.*

▪ As noted in the commentary to Alaska Evidence Rule 606(b), there was general agreement at common law "that the mental operations and the emotional reactions of jurors during the deliberative process should not be the subject of later inquiry". Howev-

er, there was "substantial disagreement" among common-law jurisdictions concerning the precise extent to which jurors might be examined about other aspects of their deliberations. Commentary, Alaska Evidence Rule 606(b), first paragraph. For example, it was only nine years ago that the United States Supreme Court resolved the question of whether jurors could be examined regarding other jurors' use of drugs and alcohol during deliberations. (The Supreme Court's decision, *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), is discussed in detail below.)

Common-law cases did agree that jurors could be questioned regarding "extraneous influences" on the jury's deliberative process. For example, in *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), the Supreme Court held that jurors could be examined regarding the possibility that, during the trial, they had heard or read prejudicial information about the defendant that had not been admitted into evidence. And in *Parker v. Gladden*, 385 U.S. 363, 365, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966), the Court ruled that jurors could testify concerning remarks by a non-juror that might have influenced the jury's deliberations (the bailiff's comment to the jurors that the defendant was "wicked", and that if there was any error in the trial, the supreme court would fix it).

In situations that did not fall within this exception for external influences, common-law decisions tended to adhere to the rule against admitting jurors' testimony to impeach a verdict. *See McDonald v. Pless*, 238 U.S. 264, 267–69, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915) (holding that a court could not receive jurors' testimony that they had determined the amount of damages by resorting to a "quotient verdict"—that is, by having each juror write down the amount of damages he thought was proper, then dividing the total by twelve); *Davis v. United States*, 47 F.2d 1071, 1071–72 (5th Cir.1931) (holding that jurors' failure to hear or understand the trial judge's instructions was an internal matter that could not be inquired into); *United States v. Dioguardi*, 492 F.2d 70, 79 (2nd Cir.1974) (holding that a court could not hold an after-verdict inquiry into a juror's apparent mental incompetence).

Eighty years ago, in *McDonald v. Pless*, the Supreme Court explained the rationale of these common-law decisions restricting inquiry into the jury's deliberations:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside [based] on the testimony of those who took part in [the decision,] and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the [jury's] finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.... [T]he result would be to make [the jury's] private deliberation[s] the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. at 267–68, 35 S.Ct. at 784, *quoted in Tanner v. United States*, 483 U.S. at 119–120, 107 S.Ct. at 2747.

Titus's case—specifically, Titus's acts of approaching several jurors and demanding to know why they had voted to convict him—demonstrates the sort of jury harassment that the Supreme Court condemned in *McDonald* and *Tanner*. The legal question presented here, however, is whether the jurors' ensuing testimony was admissible to impeach their verdict. The answer turns on whether the jurors' knowledge of Titus's reputation and behavior constituted an extraneous influence on their deliberations.

As suggested in the commentary to Alaska's Evidence Rule 606(b), the common-law cases never fully defined the concept of "extraneous influence". These cases left a gray area in which litigants might colorably claim either that juror inquiry was allowed or that juror inquiry was forbidden. Congress enacted Federal Evidence Rule 606(b) in an attempt to regulate post-verdict jury inquiries. In *Tanner*, the Supreme Court was called upon to explicate Evidence Rule 606(b).

The defendants in *Tanner* were convicted of mail fraud and conspiring to defraud the United States government in connection with Tanner's procurement of a government contract. 483 U.S. at 109–113, 107 S.Ct. at 2742–43. The defendants sought a new trial based on the affidavits of two jurors. The two jurors asserted that several members of the jury had consumed excessive amounts of alcohol or had smoked marijuana during the trial, to the point that these jurors were unable to follow the evidence or meaningfully participate in deliberations. 483 U.S. at 113–17, 107 S.Ct. at 2744–45. The questions presented to the Supreme Court were whether the two jurors' affidavits were admissible to impeach the jury's verdict, and whether the district court was obliged to examine the remaining jurors regarding these allegations. 483 U.S. at 116–17, 107 S.Ct. at 2745.

Federal Evidence Rule 606(b) states that, with two exceptions, a court conducting a post-verdict inquiry into the validity of a verdict can not receive jurors' evidence "as to any matter or statement occurring during the course of the jury's deliberations", nor as to "the effect of anything upon [their verdict]". The exceptions to this prohibition are that jurors "may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror". After reviewing the legislative history of Federal Evidence Rule 606(b), the Supreme Court concluded that Rule 606(b) was intended to protect jurors from after-the-fact inquiries such as the one proposed by the defendants in *Tanner*. Thus, the Court held, Rule 606(b) does not allow a court to receive juror affidavits or to examine jurors regarding allegations of juror intoxication.

As the Supreme Court explained in *Tanner*, the original form of Rule 606(b) (as proposed in 1972 by the Supreme Court) was intended to prohibit jurors from testifying about matters occurring during deliberations, with the exception of such extraneous influences as media accounts and bribes or threats to jurors. The House Judiciary Committee protested that the Supreme Court's proposed rule went too far. The Judiciary Committee pointed out that, under the Court's proposed rule, litigants would be unable to prove that the jury had engaged in classic forms of misconduct such as returning a quotient verdict; further, jurors would be prevented from testifying that one or more jurors had been so intoxicated as to be unable to participate in deliberations. *Tanner*, 483 U.S. at 122–23, 107 S.Ct. at 2749 (quoting House of Representatives Report No. 93–650, pp. 9–10 (1973); United States Code Congress'l & Admin. News 1974, p. 7083). The House Judiciary Committee, convinced that juror testimony should be admissible to establish any "objective juror misconduct", rejected the Court's proposed rule and substituted another that greatly broadened a court's ability to examine jurors about their verdicts. *Tanner*, 483 U.S. at 123, 107 S.Ct. at 2749.

However, the Senate rejected the House of Representative's proposal. The Senate pointed out that the House version of Rule 606(b)

> would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, for example, where a juror alleged that the jury refused to follow the trial judge's instructions or that some of the jurors did not take part in deliberations.

> Permitting an individual [juror] to attack a jury's verdict based upon the jury's internal deliberations has long been recognized as unwise[.] ... [Such a rule] would permit the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated exjurors.

> Public policy requires a finality to litigation. And common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in posttrial litigation. In the interest of protecting the jury system and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors.

*Tanner,* 483 U.S. at 124–25, 107 S.Ct. at 2749–50 (quoting Senate Report No. 93–1277, p. 13–14; United States Code Congress'l & Admin. News 1974, p. 7060).

Because of the House and Senate's disagreement, the matter was referred to a joint conference committee. The Conference Committee's report highlighted Congress's understanding of the difference between the House and Senate versions of Rule 606(b):

> The House bill allows a juror to testify about objective matters occurring during the jury's deliberation, such as the misconduct of another juror or the reaching of a quotient verdict. The Senate bill does not permit juror testimony about any matter or statement occurring during the course of the jury's deliberations.

*Tanner,* 483 U.S. at 125, 107 S.Ct. at 2750 (quoting House of Representatives Conference Report No. 93–1597, p. 8 (1974); United States Code Congress'l & Admin. News 1974, p. 7102).

After considering these competing versions, the Conference Committee recommended adoption of the Senate version of the rule. *Tanner,* 483 U.S. at 125, 107 S.Ct. at 2750. Congress accepted this recommendation and enacted the Senate version into law. *Id.*

Based on this legislative history, as well as the common law precedents that jurors could not be examined concerning insanity or mental incompetence, the *Tanner* Court held that Evidence Rule 606(b) barred the introduction of the two jurors' affidavits concerning juror intoxication and also barred the district court from holding a hearing to examine any of the jurors regarding these allegations. *Tanner,* 483 U.S. at 127, 107 S.Ct. at 2751.[3]

The Supreme Court conceded that, if post-verdict investigation into juror misconduct were allowed, such investigations would undoubtedly uncover instances of "irresponsible and improper jury behavior". *Id.* at 120, 107 S.Ct. at 2747. However, the Court doubted whether "the jury system could survive such efforts to perfect it". *Id.*

> Allegations of juror misconduct, incompetency, or inattentiveness, raised ... weeks[ ] or months after the verdict, [would] seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post[-]verdict scrutiny of juror conduct.

*Id.* at 120–21, 107 S.Ct. at 2747–48 (citations omitted).

Titus's case is governed by Alaska Evidence Rule 606(b) rather than Federal Evidence Rule 606(b). Nevertheless, the legislative history of Federal Rule 606(b) and the cases construing that rule are pertinent to our decision of Titus's case. The commentary to Alaska Evidence Rule 606(b) states that our rule was modeled after Federal Evidence Rule 606(b). *See* Commentary, Alaska Evidence Rule 606(b), first paragraph. Indeed, the portion of Alaska's Rule 606(b) that governs Titus's appeal is worded identically to its federal counterpart: a court has the authority to take affidavits or testimony from jurors only if the jurors' evidence concerns "the question whether extraneous prejudicial information was improperly brought to the jury's attention". Therefore, judicial interpretation of Federal Rule 606(b) and its state-law progeny is an important guide to interpreting Alaska's Rule 606(b)— in particular, interpreting what our rule means when it speaks of "extraneous ... information [being] improperly brought to the jury's attention".

Cases interpreting Federal Rule 606(b) and the various state versions of this rule are virtually unanimous in holding that Rule 606(b) does not allow post-verdict inquiry into the private thought processes of the

---

**3.** But see *Lowery v. State,* 762 P.2d 457, 464 (Alaska App.1988), in which this court upheld a trial court's authority to examine jurors concerning their consumption of alcohol. This court recognized *Tanner* but found it distinguishable because the jurors in Lowery's case had gone out to drink in violation of a sequestration order.

Thus, the aim of the trial court's inquiry was not to impeach the validity of the jury's deliberative process, but rather to determine whether the break in sequestration had been harmless. Compare our discussion of *Fickes v. Petrolane–Alaska,* 628 P.2d 908 (Alaska 1981) at pages 22–24 of this opinion.

jurors or the manner in which the jurors conferred to reach their verdict—even when it is clear that one or more jurors violated their oath to decide the case based solely on the evidence and the law as given by the trial judge. Thus, Rule 606(b) prohibits post-verdict examination of jurors to resolve allegations that the jury reached a compromise or "quotient" verdict, or that one or more jurors based their verdict on prejudice or unfounded speculation, or based their verdict on a misunderstanding of the facts or a blatant disregard of the law, or that a juror's deliberations or vote was influenced by supernatural "signs" or by physical or mental disability. Courts hold that such matters are not "extraneous" to the jury's deliberative process.

For instance, in *Scogin v. Century Fitness, Inc.*, 780 F.2d 1316, 1318–1320 (8th Cir.1985), one juror confided to a bystander following the return of the verdict that the jury had used the forbidden quotient method to determine damages. The court held that the juror's statement was not admissible under Evidence Rule 606(b). The same rule holds true in criminal litigation. In *United States v. Straach*, 987 F.2d 232, 241–42 (5th Cir. 1993), the court held that Rule 606(b) prohibits the court from receiving juror evidence that the jury reached a compromise verdict, or that the jurors discussed the penalties that the defendant was likely to receive if convicted of various counts (so long as the jurors did not resort to any outside sources of information).

In *United States v. Tines*, 70 F.3d 891, 898 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1280, 134 L.Ed.2d 225 (1996), *United States v. Muthana*, 60 F.3d 1217, 1223 (7th Cir.1995), and *Robles v. Exxon Corporation*, 862 F.2d 1201, 1208–09 (5th Cir.1989), *cert. denied*, 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 434 (1989), the courts held that Rule 606(b) prohibits a court from receiving a juror's testimony that the jurors misinterpreted the trial judge's instructions. And in *Mahoney v. Vondergritt*, 938 F.2d 1490, 1493–94 (1st Cir.1991), *cert. denied*, 502 U.S. 1104, 112 S.Ct. 1195, 117 L.Ed.2d 436 (1992), and *United States v. Resko*, 3 F.3d 684, 695 n. 9 (3rd Cir.1993), the courts held that Rule 606(b) prohibits post-verdict inquiry into whether the jurors engaged in deliberations before the close of the evidence.

In *United States v. DiSalvo*, 34 F.3d 1204 (3rd Cir.1994), one juror remarked during deliberations, "You can't get into this situation without being guilty." The court held that Rule 606(b) barred juror testimony concerning this remark. *Id.* at 1224–25. In *United States v. Martinez–Moncivais*, 14 F.3d 1030 (5th Cir.1994), *cert. denied*, 213 U.S. 816, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994), two jurors suggested that, if the defendant was truly innocent, he would have taken the stand. Here, too, the court held that Rule 606(b) barred juror testimony concerning this matter. *Id.* at 1036–37. *Accord State v. DeGrat*, 128 Idaho 352, 913 P.2d 568, 570–71 (1996) (holding that Idaho Evidence Rule 606(b) bars evidence that the jurors held the defendant's failure to testify against him).

In *United States v. Thomas*, 946 F.2d 73 (8th Cir.1991), a juror remarked during deliberations that an attorney friend had told her that criminal defendants rely on self-defense only when there is no other defense available. Upon inquiry into this incident, the trial court found no evidence that the juror's conversation with the attorney occurred during the trial. Based on this finding that the juror possessed her legal "knowledge" before the trial began, the appeals court held that further inquiry into this matter was barred by Evidence Rule 606(b). *Id.* at 75–76.

In *United States v. Webster*, 960 F.2d 1301, 1304–06 (5th Cir.), *cert. denied*, *Nelson v. U.S.*, 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992), the court held that Rule 606(b) bars inquiry into whether a juror's hearing problem was so acute as to effectively prevent the juror from meaningfully participating in deliberations. In *United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1579 (9th Cir.1989), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990), one of the jurors apparently believed that she had received a sign from God concerning the proper verdict when another juror wore his blue blazer on a particular day. The court held that inquiry into this juror's decision-making process was barred by Evidence

Rule 606(b). Similarly, in *State v. DeMille,* 756 P.2d 81 (Utah 1988), one of the jurors confided after the verdict that God had given her a sign that the defendant was guilty. (The sign was that the defendant's attorney failed to make eyecontact with the juror during summation.) The court held that the juror's belief that she had received divine revelation did not constitute "extraneous" information, and thus Evidence Rule 606(b) barred inquiry into the juror's statement. *Id.* at 83–84.

The rule is quite different when the court is called upon to investigate the possibility of third-party influence on the jury. Rule 606(b) authorizes a court to examine jurors regarding the possibility that "any outside influence was improperly brought to bear upon any juror". Thus, Rule 606(b) carries forward the commonlaw rule that "[p]rivate communications ... between jurors and third persons ... are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is [demonstrated]." *Mattox v. United States,* 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892).

Alaska decisions are consistent with federal cases on this issue. For example, this court has allowed post-verdict examination of jurors to determine whether a juror had a conversation with the crime victim during trial, *Swain v. State,* 817 P.2d 927 (Alaska App.1991), and whether the jurors were exposed to a newspaper article during trial that contained inadmissible evidence, *Ciervo v. State,* 756 P.2d 907 (Alaska App.1988), *overruled in part* by *Swain.*

But *Swain* and *Ciervo* do not answer the question presented in Titus's case. Titus claims that his trial was unfair, not because the jurors obtained information from third parties, but because the jurors relied on their own personal knowledge of Titus or their knowledge of Titus's reputation—knowledge that the jurors possessed when the trial began.

It might be argued that the term "extraneous information" encompasses any and all information outside of the evidence properly admitted at trial. However, both the Alaska Supreme Court and this court have rejected

such an interpretation of Alaska Evidence Rule 606(b).

In *Tellier v. Ford Motor Company,* 827 P.2d 1125 (Alaska 1992), the trial judge had issued a protective order barring Ford Motor Company from introducing evidence of Tellier's prior conviction for sexual abuse of a minor. However, through the parties' inadvertence, the jury received a trial exhibit that contained information about Tellier's prior conviction. *Id.* at 1126. After the jury returned a verdict in favor of Ford Motor Company, the error was discovered and Tellier sought a new trial. Tellier contended that the information about his prior conviction unfairly prejudiced the jurors against him. *Id.* at 1126–27. Trying to defend the verdict, Ford Motor Company submitted affidavits from two jurors. According to these two affidavits, the jury had not discovered the improper evidence until after their deliberations were concluded. *Id.*

On appeal, Tellier argued that Ford Motor Company violated Evidence Rule 606(b) when it obtained and presented the jurors' affidavits. The Supreme Court agreed:

> Because Ford questioned [the two jurors] as to the effect on the jury of the references to Tellier's prior conviction contained in Exhibit B, *and because those references were not "extraneous" for purposes of [Evidence] Rule 606(b),* we find that Ford violated Rule 606(b) in taking the affidavits. We therefore do not consider the affidavits in deciding this case.

*Tellier,* 827 P.2d at 1127 n. 1 (emphasis added). Thus, the Supreme Court apparently held that inadmissible evidence is not "extraneous" if it comes to the jury's attention during the normal trial process, even when the jury's knowledge of the information arises from a procedural mistake.

This court reached a similar conclusion in *Turpin v. State,* 890 P.2d 1128 (Alaska App. 1995). The defendant in *Turpin* was convicted of sexual abuse of a minor. On appeal, he contended that the prosecutor had made an improper comment to the jury during opening statement—a comment implying that Turpin had committed other, uncharged acts of sexual abuse. *Id.* at 1130. Turpin did not object to the prosecutor's remark at the time,

but, after the jury found him guilty, Turpin sought a new trial based on the prosecutor's comment. *Id.* According to Turpin's motion, two jurors who were interviewed after the trial indicated that, based on the prosecutor's remark, they believed that Turpin probably had committed other acts of sexual abuse. *Id.*

Turpin's attorney conceded that Evidence Rule 606(b) restricts a court's ability to question jurors about their verdict, but he contended that the prosecutor's comment was "extraneous" because it was improper (that is, the jury never should have heard it). *Id.* at 1131. This court rejected Turpin's contention:

> "[E]xtraneous" information refers to information that reaches the jury other than through the normal trial process; it does not refer to objectionable statements of counsel made during trial or objectionable testimony given at trial. *See* Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual* (6th ed. 1994), Vol. 2, p. 777[.] . . .
>
> Turpin's interpretation of "extraneous" information would essentially gut Rule 606(b), since it would allow impeachment of a verdict whenever the jurors heard improper arguments of counsel, improperly admitted evidence, or any questions or answers to which objections were sustained. Because claims of such errors arise at practically every trial, virtually any jury verdict would be subject to inquiry under Turpin's suggested reading of Rule 606(b). We reject this reading of the rule.

*Turpin,* 890 P.2d at 1131.

Still, *Tellier* and *Turpin* do not resolve Titus's case. The jurors in Titus's case did not obtain their challenged knowledge of Titus through the trial process. Instead, that knowledge was part of the life experience they brought with them when jury selection began. *Tellier* and *Turpin* do not answer the question of whether such knowledge is "extraneous" information (so that the superior court might properly receive and consider the jurors' testimony in resolving Titus's attack on the verdict).

Titus's case would be more easily resolvable had he presented evidence suggesting that the jurors concealed their knowledge of him during voir dire. If the superior court had been presented with evidence suggesting that one or more of the jurors had either intentionally or recklessly concealed their knowledge of Titus during voir dire, then, notwithstanding Evidence Rule 606(b), the superior court would have been authorized to examine the jurors to determine (1) if the challenged jurors had in fact concealed material knowledge during voir dire and, if so, (2) whether the jurors relied on this previously concealed knowledge during jury deliberations. *Fickes v. Petrolane–Alaska Gas Service, Inc.,* 628 P.2d 908, 910–11 (Alaska 1981).

*Fickes* involved a claim for damages arising from an explosion at a trailer court. The plaintiffs claimed that the explosion had been caused by a gas leak, and that the gas had been leaking because the defendant had negligently installed or had negligently maintained the gas lines. The jury found for the gas company. *Id.* at 909. After the verdict was returned, three of the jurors filed affidavits attacking the verdict. These jurors claimed that, during deliberations, a juror named Vandenberg had relied on his personal knowledge of one of the witnesses, a mechanic named Whaley. According to the affidavits, Vandenberg told the other members of the jury that he knew Whaley to be a good mechanic, and that if Whaley performed the repairs on the Petrolane system, those repairs undoubtedly were done properly. *Id.* at 910.

Based upon these affidavits, the supreme court concluded that Vandenberg "either intentionally or inadvertently failed to disclose [during voir dire] that he knew . . . Whaley", and that Vandenberg's failure to disclose this pertinent fact was "tantamount to an obstruction of justice".

> We hold that [a juror's] failure . . . to acknowledge an acquaintance with a witness, [followed by the juror's argument concerning] the probability of a fact . . . based on that acquaintance, that is, based on evidence outside the record, constitutes an obstruction of justice.

*Fickes,* 628 P.2d at 911.

The *Fickes* decision was based on the com-

mon law.[4]  However, the holding in *Fickes*— that a jury verdict can be attacked by showing that jurors concealed material facts during voir dire—is consistent with the policy of Evidence Rule 606(b).  In fact, cases decided under Rule 606(b) unanimously agree that this continues to be the correct result.

Rule 606(b) restricts a court's ability to examine jurors when the purpose of the inquiry is to invalidate the jury's verdict based on "any matter or statement occurring during the course of the jury's deliberations".  In *Fickes,* on the other hand, the juror's statements were introduced to show that the juror failed to reveal material information during voir dire—information that would have affected whether the juror became a member of the jury in the first place.  While the collateral consequence of voir dire fraud might often be invalidation of the verdict, the *Fickes* opinion clearly focused on the defect in voir dire.[5]

Current federal case law comes to the same conclusion under Rule 606(b).  As summarized in Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal Rules of Evidence Manual* (6th ed. 1994), Vol. 2, p. 776:

> [Federal] Rule 606(b) would appear to preclude testimony concerning the effect of a juror's bias on deliberations. [*See, e.g., Martinez v. Food City, Inc.,* 658 F.2d 369 (5th Cir.1981) (evidence of "improper motives of individual jurors" is excluded under Rule 606(b); such biases should be uncovered when the jury is being selected).] However, assuming that voir dire is minimally adequate, a juror who is unwavering in his bias is likely to have lied during voir dire.  Rule 606(b) applies to jury deliberations, but it does not apply to pretrial voir dire.  Accordingly, evidence could be presented about the juror's lies on voir dire in an attempt to overturn a verdict. [*See, e.g., United States v. Colombo,* 869 F.2d 149 (2nd Cir.1989) . . .; *State v. Martinez,* 90 N.M. 595, 566 P.2d 843 (N.M.App.1977) (Court held that [the] state version of Rule 606(b) allowed an inquiry into ... whether a juror lied on voir dire, because the issue did not involve impeaching the verdict, but rather the qualifications of one of the jury members to serve as a juror).]  The primary focus would be on what one juror did and the way he felt before the deliberations, rather than on anything done during the deliberations.

(The bracketed text indicates footnotes in the original.)  *Accord, Rios v. Danuser Machine Co., Inc.,* 110 N.M. 87, 792 P.2d 419, 423 (N.M.App.1990).

However, Titus has never claimed that the jurors in his case concealed their knowledge of him during voir dire.  As noted above, it appears that the Fort Yukon jurors were more than willing to admit their acquaintance with Titus during voir dire.  The record shows that all but one of the jurors selected to try this case either knew Titus personally or knew of Titus and had heard about the case prior to trial.  (Titus chose to leave these people on his jury; he did not exercise all of his peremptory challenges.)

The question then becomes: in the absence of an allegation of voir dire misconduct, does Evidence Rule 606(b) allow a court to question jurors after they have returned their verdict to determine whether one or more

---

4.  Although the supreme court issued *Fickes* in May 1981 (about a year and a half after the enactment of the current Alaska Rules of Evidence), the court did not mention Rule 606(b) in its opinion and instead relied on cases construing the common law of evidence.  (The explanation may be that the trial court proceedings litigated in *Fickes* occurred before the effective date of the new rules of evidence.)  Despite the common-law foundation of *Fickes,* this court's decisions in *Swain* and *Ciervo* assumed that *Fickes* continued to be good law even after the enactment of Evidence Rule 606(b).  As explained in the main text, this assumption is borne out by judicial decisions under Rule 606(b).

5.  When the court assessed whether Vandenberg's failure to reveal his knowledge of the mechanic required a new trial, the supreme court's first question was, "[I]f the party asserting prejudice had known the true facts, is it probable that [the party] would have challenged the juror?" *Fickes,* 628 P.2d at 911.  The court indicated that the answer to this question was just as important as determining whether the juror's comment had prejudiced the jury's consideration of a crucial claim or defense.  *Id.*

jurors used their pre-existing personal knowledge to decide the case, or whether any jurors communicated their pre-existing knowledge during deliberations? Cases decided under Federal Evidence Rule 606(b), as well as cases decided under state evidence rules based on Federal Rule 606(b), are essentially unanimous in concluding that a court is barred from conducting this type of post-verdict inquiry—because a juror's pre-existing knowledge is not "extraneous" information.

In *Hard v. Burlington Northern Railroad Co.*, 870 F.2d 1454 (9th Cir.1989), the parties were litigating a personal injury action brought by a railroad employee. One of the jurors happened to have personal experience working for a railroad. *Id.* at 1459. This same juror also had acquired some familiarity with x-rays while serving in the military. *Id.* at 1460. During deliberations, the juror commented on his experience in the railroad industry, and he offered his own interpretation of the x-ray evidence. The court held that the juror's reliance on his personal knowledge did not constitute "extraneous information" for purposes of Federal Evidence Rule 606(b), and thus the trial court was prohibited from examining the jurors about these matters. *Id.* at 1462.

In *State v. Kelman*, 276 Mont. 253, 915 P.2d 854 (1996), one of the jurors remarked during deliberations that "she believed that Dave Kelman owned the Playground Bar in Great Falls". The Playground Bar was apparently a strip club of bad repute. *Id.* 915 P.2d at 859. The court held that the juror's prior knowledge of Kelman's association with the Playground Bar was not "extraneous" information, and thus Montana Evidence Rule 606(b) barred further inquiry. *Id.* 915 P.2d at 860.

In *State v. Hage*, 258 Mont. 498, 853 P.2d 1251 (1993), the jury apparently relied on one juror's assertion that, from personal knowledge, he knew that a log was kept of all telephone calls made from the jail. *Id.* 853 P.2d at 1256. The court held that Montana Evidence Rule 606(b) barred the court from examining the jurors about this aspect of their deliberations because such pre-existing knowledge is not "extraneous". *Id.* 853 P.2d at 1257–58.

In *People v. Szymanski*, 226 Ill.App.3d 115, 168 Ill.Dec. 34, 589 N.E.2d 148 (1992), one of the jurors lived in the area where the crime occurred. Being familiar with the area, she drew a map for the other jurors' use during deliberations. *Id.* at 151, 168 Ill.Dec. at 37. The court held that the juror's pre-existing knowledge of the area was not "extraneous" information. *Id.* at 152, 168 Ill.Dec. at 34.

In *Garcia v. State*, 777 P.2d 603 (Wyo. 1989), one or more jurors commented during deliberations on the fact that they had seen the defendant in handcuffs. Another juror responded that he knew that the defendant had been in trouble with the law before. *Id.* at 608. The court held that these statements did not reflect "extraneous" information, and thus Wyoming Evidence Rule 606(b) barred further inquiry. The court declared that "[n]ormal jury deliberations [will not be overturned] merely because the jurors' generalized knowledge about the parties or some other aspect of the case is an ingredient of the [jury's] decision." *Id.*

In *Brooks v. Zahn*, 170 Ariz. 545, 826 P.2d 1171, 1176–78 (Ariz.App.1991), one of the jurors was a registered nurse who relied upon her medical knowledge and experience during the deliberations. The court held that the juror's prior knowledge was not "extraneous", and therefore the court was prohibited by Arizona Evidence Rule 606(b) from examining the jurors about this matter. Similarly, in *State v. Aguilar*, 169 Ariz. 180, 818 P.2d 165 (Ariz.App.1991), one of the jurors was a medical doctor. He "shared with the other jurors [his] fund of knowledge ... regarding alcohol and cocaine ... blackouts." *Id.* 818 P.2d at 166. He also told the other jurors that he disagreed with the defendant's expert witness who had testified that the defendant lacked criminal intent because of his alcohol and cocaine consumption. *Id.* 818 P.2d at 166–67. The court held that the doctor's knowledge was not "extraneous" information, and thus Arizona Evidence Rule 606(b) prohibited the court from receiving the jurors' testimony on this matter. *Id.* 818 P.2d at 167.

*See also State v. DeMille,* 756 P.2d 81 (Utah 1988), in which the defendant was convicted of second-degree murder after a three-year-old child left in his care died from a massive skull fracture. During deliberations, some of the jurors referred to their personal experiences of child abuse and spoke openly of their personal bias against child abusers. *Id.* at 83. The court held that, because the jurors had not been voir dired about these matters (that is, they had not deceived the court or the parties about their past experiences or their potential biases), the defendant was foreclosed from arguing that the jurors were biased in their deliberations.[6]

Based on the foregoing authorities, we conclude that the jurors' prior knowledge of Titus (his character, his activities before trial, and/or his reputation) did not constitute "extraneous" information for purposes of Alaska Evidence Rule 606(b). The superior court was therefore prohibited from receiving the jurors' evidence upon these subjects when the court decided Titus's attack on the verdict.

Although our decision is adequately supported by the case law discussed above (defining the meaning of "extraneous"), we believe that our interpretation of Evidence Rule 606(b) is the correct result for another reason. Both the Federal Constitution and the Alaska Constitution contain guarantees that favor holding criminal trials in the locality of the alleged crime. *See* United States Constitution, Article III, Section 2, and Sixth Amendment; Alaska Constitution, Article I, Section 11, as interpreted in *Alvarado v. State,* 486 P.2d 891 (Alaska 1971). These guarantees are premised on the idea that the jury functions as a representative body, that it should express the knowledge and sentiments of the community affected by its decisions, and that jurors should therefore be chosen from among the people who live in that locality. In other words, the drafters of the two constitutions believed that, generally speaking, there is a better chance that justice will be done if jurors are selected from people familiar with the community's culture and general conditions of life.

> The necessity for selection of juries from a source which truly represents a fair cross section of the community cannot be overemphasized. The jury is an essential institution in our democracy, and [it] serves multifaceted purposes. It is, of course, primarily charged with the task of finding the truth of the facts asserted. Yet beyond its [role] as a finder of fact, the jury fulfills other equally vital political and psychological purposes.... As an institution, the jury offers our citizens the opportunity to participate in the workings of our government, and [it] serves to legitimize our system of justice in the eyes of both the public and the accused.

*Alvarado,* 486 P.2d at 903.

Because of the constitutional preference for holding trials in the locality where the crime occurred, prospective jurors will often possess more particularized knowledge of the case than simply an understanding of the physical and cultural milieu in which it arose. This is especially true in Alaska, a state containing many towns and villages with populations of less than a thousand. In such localities, essentially all eligible jurors will know the defendant, the victim, and any other major witnesses, either personally or by reputation.

Community knowledge of the defendant does not necessarily mean that the defendant has secured a "home court advantage". Sometimes, the community's knowledge of the defendant will work against him rather than in his favor. The law recognizes the defendant's right to seek a change of venue

---

6. But see *Shillcutt v. Gagnon,* 827 F.2d 1155 (7th Cir.1987), a case in which a certain juror evinced racial prejudice during deliberations. The court recognized the all-but-unanimous authority that Evidence Rule 606(b) bars inquiry into jurors' statements of racial prejudice, and the court ultimately denied Shillcutt's habeas corpus petition. However, the court cautioned that its decision was based partly on its conclusion that the remarks in question were not egregious. *Id.* at 1159–60. The court declared that, even though Evidence Rule 606(b) barred inquiry, the court would not allow Rule 606(b) to "be applied in such an unfair manner as to deny due process". *Id.* at 1159. The court indicated its willingness to authorize juror examination, even in the face of Rule 606(b)'s prohibition, "in order to discover the extremely rare [case in which racial] prejudice pervaded the jury room". *Id.*

**1178**

because of local prejudice against him. *See Alvarado,* 486 P.2d at 904 n. 38. However, given the law's preference for holding trials in the neighborhood of the crime, and given the law's recognition that jurors should bring their life experience with them to the jury room, it would be essentially self-defeating for courts to invalidate jury verdicts whenever it was shown that the jurors' personal knowledge of the surrounding facts or their personal knowledge of the participants was broader than the evidence admitted at trial.

■ This is especially true in cases like Titus's, where a defendant actively seeks trial in a locality where he or she is well-known. As Titus candidly admits in his brief to this court, he "erroneously assumed that his reputation [in the community] would assure a not guilty verdict". Under such circumstances, courts quite properly should be cautious when they are asked to overturn a jury verdict based on allegations that the jurors relied to some extent on their knowledge of the defendant or his reputation in the community. Otherwise, defendants like Titus would be able to "take a gambler's risk and complain only if the cards fell the wrong way". *Turpin v. State,* 890 P.2d 1128, 1130 (Alaska App.1995) (quoting *Owens v. State,* 613 P.2d 259, 261 (Alaska 1980)).

*Conclusion*

Alaska Evidence Rule 606(b) barred Judge Green from examining the jurors concerning the matters raised in Titus's motion for new trial. We therefore REVERSE the superior court's order granting Titus a new trial, and we reinstate the jury's verdict.